1  CHRISTOPHER ADAME # V64509
2  CSATF E-2-116ᵁ
   P.O. BOX 5242
3  Corcoran CA 93212

4  Petitioner, In Pro Per

FILED

ORIGINAL  2008 AUG 25 PM 4:16

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

6           UNITED STATES DISTRICT COURT

7        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

8  CHRISTOPHER ADAME                    Case No. (08CV0787HCAB)
9              Petitioner,              OBJECTIONS TO MAGISTRATE'S
10      vs.                             REPORT AND RECOMMENDATION
                                        REGARDING PETITION OF WRIT OF
11 MATTEW CATE, Secretary,              HABEAS CORPUS
12             Respondent.
13

14

15              INTRODUCTION

16     Petitioner, a state prisoner proceeding pro se, has filed a Petition for

17 Writ of Habeas Corpus pursuant to 28 U.S.C. 2254, challenging his San Diego Superior

18 Court convictions in Case Nos. SCD176307 and SCD180441. Petitioner's convictions are

19 listed and described in detail in his Petition, in the Answer, and in the Magistrate's

20 Report and Recommendation. Petitioner's federal constitutional rights were violated

21 as follows: (1) the admission at trial of the preliminary hearing testimony of the prosecutrix

22 witness violated petitioner's Sixth Amendment right to confront and cross-examine

23 his accuser, and failed to meet the requirements of evidence code 240 by establishing

24 the state's due diligence to locate the witness; and (2) petitioner's counsel was

25 ineffective in failing to litigate his Fourth Amendment issues. Petitioner requests an

26 evidentiary hearing on all of his claims, and the motion for appointment of counsel.

27     Petitioner requests that the District Judge in this case thoroughly review his Petition

28 and Traverse. The Magistrate merely recites the Court of Appeals Opinion in her Report

                        1

1  and Recommendation and thereby shows that no time nor consideration was given on
2  petitioner's Petition and Traverse.
3      Petitioner, in support of his Petition and Traverse, sets forth his Objections
4  to the Magistrate's Report and Recommendation below.

## GROUND ONE

6      Petitioner was denied his Sixth Amendment right to confront witnesses when
7  the trial court allowed the prosecution to introduce Pamela's testimony from the
8  preliminary hearing at trial. The trial court also erred when it found Pamela to be
9  unavailable to testify at trial because the prosecution failed to meet the requirements
10  of Evidence Code 240 by establishing the state's due diligence to locate the witness
11     The Magistrate mentions under the Sixth Amendment, the prosecution may not
12  admit a prior statement that is testimonial in nature unless: (1) the accussed has had
13  a meaningful opportunity to confront the witness; and (2) the witness is unavailable
14  to testify at trial. Crawford v. Washington, 541 U.S. 36, 68 (2004); United v. Yida, 498
15  F.3d 945, 950 (9th Cir. 2007); see also Barben v. Page, 390 U.S. 719, 724-25 (1968)
16  (holding that the admission of prior testimony that had been subjected to cross-
17  examination violated the Confrontation Clause because the state did not prove that
18  the witness was unavailable).
19     Petitioner responds to the Magistrate's statements concerning: (1) opportunity
20  to cross-examine and (2) unavailability in the following:
21      1. Opportunity to Cross-Examine
22      The right to confront one's accuser, provided in the Sixth Amendment
23  and the California Constitution, art. I, section 15, seeks,
24      "to ensure that the defendant is able to conduct a 'personal examination
25  and cross-examination of the witness, in which [the defendant] has an opportunity,
26  not only of testing the recollection and sifting the conscience of the witness, but
27  of compelling him to stand face to face with the jury in order that they may
28  look at him, and judge by his demeanor upon the stand and the manner in

which he gives his testimony whether he is worthy of belief.'" (People v. Louis (1986) 42 Cal. 3d 969, 982, quoting Mattox v. United States (1895) 156 U.S. 237, 242-243). To deny or significantly diminish this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling "into question the ultimate ("integrity of the fact-finding process."'" (Chambers v. Mississippi (1973) 410 U.S. 284, 295.) (People v. Cromer, 24 Cal. 4th 889, 897)

Pamela was not present at trial. Therefore, Pamela did not stand face to face in front of a jury. The jury was unable to look at her in person and judge by her demeanor upon the stand and the manner in which she gives her testimony whether she is worthy of belief. Instead, a cold transcript was read to the jury by a member of the district attorney's office, thus denying the defendant (petitioner) of the essential means of testing the credibility of the witness (Pamela), thus calling into question the ultimate "integrity of the fact-finding process."

In People v. Louis (1986) 42 Cal. 3d., the Court ruled that the admission of an unavailable witness's (Tolbert's) preliminary hearing testimony at the defendant's trial was error. In that particular case the Court stated that there was no witness whose testimony was more critical to the prosecution's case against defendant than Tolbert. In fact the sole evidence identifying defendant as the triggerman came from him. Further on, the Court states: Tolbert's credibility was suspect. It was known by the parties and the Court that Tolbert had been convicted of several felonies, committed to a hospital for criminally insane, used 9 or 10 aliases; habitually failed to make court appearances and had to be arrested to compel his testimony. For these reasons the trustworthiness of Tolbert and his testimony was recognized by all to be open to serious question. Tolbert was precisely the witness that a jury needs to scrutinize in person in order to intelligently evaluate his credibility and the truth or falsity of his testimony.

In petitioner's case, there was no witness whose testimony was more

3

1 critical to the case against him than Pamela's. In fact, the hearsay testimony of Pamela
2 was the only evidence establishing the charges against petitioner. Convictions coming from
3 those charges made petitioner eligible for an indeterminate life term under Penal Code
4 section 667.61

5      Pamela's credibility was suspect. Pamela gave various versions of what allegedly
6 happened to every single law enforcement officer she was interviewed by (5). The discrepancies
7 in her stories was significant. At the preliminary hearing, Pamela claims she gave the
8 same version to all, the police reports reflect that is a lie. Pamela stated she was
9 not raped to Officer King - the first officer on the scene - in fact, she denied being
10 raped three times to him! Pamela had another case against a different man of a
11 similar nature - he was convicted. Pamela was a prostitute, with criminal convictions,
12 who was currently on probation. Pamela had other aliases, missed court appearances,
13 and had to be escorted to court for the preliminary hearing. Note: Pamela did not
14 initiate to have police contacted when the alleged incident occured, her boyfriend /
15 pimp Pierre Hawkins told security guards who then notified police. For these reasons
16 and others, the trustworthiness of Pamela and her testimony was recognized by all
17 to be open to serious question. Pamela is precisely the type of witness that a
18 jury needed to scrutinize in person in order to intelligently evaluate her credibility
19 and the truth or falsity of her testimony.

20      In Ohio v. Roberts (1980) 448 U.S. the Court reasoned that normally there is
21 little incentive to cross-examine a witness at a preliminary hearing, where the "ultimate
22 issue" is only probable cause, and citing the dissenting opinion (California v. Green
23 399 U.S. 149 (1970) the Court held that the mere opportunity to cross-examine at a
24 preliminary hearing did not afford constitutional confrontation for purposes of trial.

25      A preliminary hearing is just that, a hearing that determines if there is
26 probable cause to bind the defendant over for trial. Around 95 percent of the time,
27 the defendant is held over for trial due to the low bar of standards. A person
28 testifying against the accused is all it takes. For those reasons, defense attorneys

1 | do not wage a full out cross-examination in not wanting to reveal their strategy for
2 | the trial to the opposition. A trial is the real deal. A jury determines whether the
3 | defendant is innocent or guilty beyond a reasonable doubt based on the evidence brought
4 | forth and the testimony of the witnesses. There is no jury at the preliminary hearing—a
5 | judge makes a ruling on the defendant. There is no comparison between the two—a
6 | preliminary hearing and an actual trial. To conclude that they carry the same weight
7 | preposperous and unconstitutional.

8 |      The Magistrate's Report and Recommendation fails to take in the fact
9 | that petitioner was denied the opportunity to cross-examine Pamela on the
10 | new evidence that was revealed during petitioners trial. That new information
11 | would concern what was said between Gloria Tena and Erin Kerchner at the
12 | ACS center in La Mesa concerning tampering and coercion from the D.A.'s office,
13 | Erin's recantation, and the Roxanne Chavez - Detective McFalls confrontation
14 | before the preliminary hearing. Pamela was present and a witness to this
15 | confrontation. Please see Footnote #1 in petitioners Traverse and the entire
16 | Gloria Tena trial transcript testimony beginning on p. 698 concerning the above
17 | and the sidebar discussion of the judge and D.A. instructing Gloria Tena that she
18 | could not testify about the Roxanne Chavez - Detective McFalls incident. Gloria
19 | Tena was interviewed and gave a signed statement to the District Attorneys
20 | office concerning the above mentioned. This new information was not known
21 | to the defense at the time of the preliminary hearing. It was not known until
22 | the second day of trial. No doubt the petitioner was deprived of an opportunity
23 | to cross-examine Pamela on this matter. Trial counsel undoubtedly would have
24 | liked to question Pamela concerning this new information and would have had
25 | a different approach to this witness than petitioners preliminary hearing
26 | lawyer.

27 |
28 |

5

## 2. Unavailable

The prosecution failed to take appropriate measures to assure Pamela would be present at trial. Once Pamela's testimony was memorialized at the preliminary examination, the prosecution made only perfunctory efforts to locate her, knowing that her prior testimony would be admissible.

The Magistrate cites Christian v. Rhode, 41 F. 3d 461, 467 (9th Cir. 1994) "while no court has articulated a standard for the diligence required of the prosecution ... it is clear that herculean efforts are not constitutionally required."

The efforts that petitioner cites that prosecution failed to do are far from being "herculean", basic is more like it. The prosecution did not contact Pamela's parents, her other sister, the other listed boyfriend (Anthony Watson), her place of employment (MissBehavin'/Naughty Housewives Escort Services), the boyfriend Pierre Hawkins' auto and car repair shop, the local and Las Vegas Post Offices, the phone companies – all basic efforts.

The prosecution merely made perfunctory efforts - efforts that were basically "window dressing" - making it look like they did some type of effort when they really did nothing. The alleged pager that Pamela was given was a non-factor - it was not used the last six months before trial, subpoenas were left at a sister's to be given to Pamela who only had occasional contact with her. Once it was known that Pamela was allegedly in Las Vegas, the prosecution's investigator merely made a few phone calls and computer checks. Checking police databases is useless if Pamela has no police contacts. They checked the Department of Motor Vehicles knowing Pamela had no transportation. Two of the boyfriend's former addresses was checked - it's obvious that they would not be at places where they once lived at. One of the former addresses checked was Pierre Hawkins' ex-wife's. I doubt that they'd be shacking up at the ex-wife's home. There is no mention of Investigator Garcia checking Pierre Hawkins' current address, nor were any efforts made to locate the other boyfriend, Anthony Watson - no checks done on him. Pamela

1  could have been with him. Also Investigator Garcia did not contact Pamela's
2  probation officer and failed to notify her about the August trial date in her
3  last conversation with her. The prosecutor gave testimony - not under oath, nor sworn
4  in - that Pamela was informed of the August trial date by herself. Prosecutor gave
5  this testimony (unsworn) right after Investigator Garcia admitted she failed to
6  notify Pamela of the new court date.
7     In People v. Louis (1986) the court mentions: The requirement of due
8  diligence is a stringent one for the prosecution (People v. Jackson). It is more
9  stringent still, when, the absent witness is vital to the prosecution's case and
10 his credibility is suspect (U.S. v. Mann 590 F. 2d 361,367).
11    In petitioner's case, Pamela's testimony at the preliminary hearing was
12 crucial to the prosecution. It was the only evidence establishing the charges
13 against petitioner - there was no other evidence. There is no question Pamela's
14 credibility was suspect. She fluctuated in her stories to various law enforcement,
15 she was a prostitute with criminal convictions and ongoing arrest warrants, she
16 missed court appearances, had to be escorted to the preliminary hearing. A more
17 stringent showing was necessary in petitioner's case.
18    In U.S. v. Mann 590 F. 3d 863,471 the Court states regarding this case:
19 Here the witness is vital to the government's case. The government did not
20 make as vigorous an attempt to secure the presence of the witness as it would
21 have made if it did not have the prior recorded testimony. The language of
22 Rule 804 (a)(5) suggests that "other reasonable means" besides subpoenas must
23 be tried before a witness can be found unavailable. This relatively high good
24 faith standard cannot be satisfied by perfunctory efforts, if the rule is not to
25 sanction the government's procuring despositions of witnesses, especially shaky
26 witnesses, but to discourage attempts to bring the witness to trial so long as
27 the government is satisfied with what is in the transcript.
28    Again, Pamela was vital to the prosecution's case against petitioner.

7

1  The prosecution did not make as vigorous an attempt to secure Pamela's presence
2  as they would have made if they did not have her prior recorded testimony. High
3  good faith standards were not conducted in petitioner's case, perfunctory efforts
4  at best. Pamela was as shaky a witness as they come. She told one law
5  enforcement official she wasn't raped, another she told she was raped in the
6  front seat of the vehicle, another she told she was raped in the back seat of
7  the vehicle, another she told she was raped outside the vehicle. She goes
8  back and forth about whether a condom was used or wasn't used and whether
9  petitioner ejaculated inside her or not. Pamela refused a SART test and
10 refused to give up her pants for DNA testing. High good faith efforts were
11 necessary in this case.
12     In Motes v. U.S. 178 U.S. 458 (1900) the Court ruled: the right of an
13 accussed under U.S.C.A. Const. Amend. 6, to be confronted with witnesses against
14 him, is violated by permitting a disposition or statement of an absent witness taken
15 at an examinary trial to be read at the final trial, when it does not appear that the
16 witness was absent by the suggestion, connivance, or procurement of the accused
17 but it does appear that the absence was due to the negligence of the prosecution.
18     Pamela was in no way discouraged by petitioner to attend his trial,
19 in fact they were hoping that she'd attend the trial so that they may question
20 her in front of a jury. The prosecution made insuffient efforts in securing
21 Pamela's presence at trial, especially given the knowledge of the witness.
22 Pamela was a working prostitute, not a typical "citizen witness". She kept
23 changing her stories to police officials. She appeared at the preliminary
24 hearing only after being escorted by an investigator. Thereafter, she became
25 elusive. She bounced around from hotel to hotel, Didn't answer the pager,
26 she had to be served with subpoenas on the streets with vice officers who
27 ignored the fact that her acts of prostitution violated her probation. Pamela
28 failed to appear at court appearances, she also had warrants for her arrest

1  concerning prostitution charges. The prosecution had clear knowledge that it
2  was going to be difficult to secure Pamela's presence at trial. In fact, it was
3  best for their case that she not be present at trial considering the shaky
4  testimony she gave at the preliminary hearing. It was best for them that
5  a cold transcript could be read to the jury than have Pamela give a shaky
6  account that would surely hurt their case against the petitioner. The absence
7  of Pamela shows clear negligence by the prosecution.
8      The Magistrate cites the state court's opinion where they determined the
9  prosecution demonstrated due diligence in attempting to secure Pamela's presence at
10 trial because they attempted to stay in touch with her while in San Diego, and by
11 accessing various computer databases after she failed to appear for a court date.
12     However, the court's opinion makes no mention of the controlling standard
13 set forth in People v. Cromer, supra, 24 Cal. 4th at p. 904.
14     This court emphasized in Cromer that the state's efforts in attempting
15 to locate a witness must be persevering, and tireless. This must mean that in
16 attempting to locate a witness for trial the state must make more than a pro forma
17 effort by searching a few data bases from the officer's desk.
18     The police knew Pamela was working the streets of Las Vegas, and they could
19 easily have found her if someone traveled to Las Vegas and enlisted the help of the
20 local vice squad who keeps tabs of prostitutes and knows the streets and hotels
21 the can be found. Calling up vice and having them run their computer checks for
22 any police contacts just doesn't cut it, especially if Pamela recently arrived there.
23     If the prosecutor needed Pamela's testimony in order to secure a conviction
24 there is no realistic doubt they would have dispatched officers to find her. By
25 proceeding as they did, through a minimalist approach, they benefitted by
26 presenting her testimony through a police officer - essentially a professional
27 witness who would not look as unreliable as Pamela in person.
28

In sum, the record shows that the prosecution did not demonstrate due diligence in attempting to locate Pamela. Whether reviewed under *People v. Watson* (1956) 46 Cal. 2d 818, for violating the Evidence Code provisions regarding unavailable witnesses, or the stricter standard set forth in *Chapman v. California* (1967) 386 U.S. 18, for depriving petitioner of his Sixth Amendment rights to confront and cross-examine his accuser, his Petition should be GRANTED. Petitioner objects to the Magistrate's Report and Recommendation on Ground One. The trial court ruled improperly in finding that prosecution made a good effort to locate Pamela and the state court's decision was contrary to and an unreasonable application of clearly established Supreme Court law. Accordingly, Petitioner's claim in Ground One should be GRANTED.

## GROUND TWO

Petitioner's counsel was constitutionally ineffective for failing to litigate the following meritorious Fourth Amendment issues: (1) Vehicle Code section 22655.5, relied upon by police to effect a warrantless seizure of petitioner's vehicle from his driveway is unconstitutional; (2) the search of a closed purse found during an inventory search of petitioner's vehicle was unreasonable, as police failed to demonstrate that they had, and followed, established procedures for conducting an inventory search of a closed container found in a vehicle; and (3) the search of petitioner's vehicle executed on August 6, 2003, was based on a warrant issued on July 23, 2003, and therefore exceeded the ten day time limit of Penal Code section 1534 subd. (a). Petitioner was prejudiced by the failure of his counsel to raise these arguments because the items discovered in his car represented the only physical evidence corroborating the victims' testimony, and the outcome would have been more favorable to him had the evidence been suppressed. Under *Strickland*, the petitioner has proven he had been denied a fair trial by the gross incompetence of his counsel.

1. Constitutionality of Vehicle Code 22655.5

On July 17, 2003, police seized petitioner's vehicle from the driveway of his residence. This warrantless seizure was performed under the authority of Vehicle Code section 22655.5.

The Fourth Amendment protects citizens against unreasonable searches and seizures. A warrantless search is presumed to be unreasonable and places the burden upon the prosecution to establish an exception to the warrant clause. (Badillo v. Superior Court (1956) 46 Cal. 2d 269, 27; People v. Williams (1988) 45 Cal. 3d 1268, 1300.)

Section 22655.5 authorizes police to seize, without a warrant, a vehicle from private property and is therefore unconstitutional. It is fundamental that a state legislative statue cannot trump the federal Constitution. (See, e.g., Stenberg v. Carhart (2000) 530 U.S. 914, and Alden v. Maine (1999) 527 U.S. 706.)

A similar argument was raised in People v. Auer (1992) 1 Cal App 4th 1664, the lone reported case addressing section 22655.5. The petitioner in Auer asserted that a literal construction of section 22655.5 would subject vehicles to a warrantless seizure for minor infractions. However, in that case, the petitioner was observed driving his vehicle on a public street by an officer who knew that his driver's license had been suspended. When he pulled into a McDonald's parking lot, officers stopped him and eventually impounded his car. The court refused to speculate how the statue may be used in other situations which would render it unconstitutional.

"One to whom application of a statue is constitutional will not be heard to attack the statue on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." (United States v. Raines (1960) 362 U.S. 17, 21.)

The statue is invalid on its face, as it authorizes warrantless seizures of vehicles located on private property, and as applied here.

The Fourth Amendment of the United States Constitution, which is enforceable against the states as a component of the Fourteenth Amendment's guaranty of due

1  process of law (Mapp v. Ohio (1961) 367 U.S. 643, 643-660) provides in relevant part:

2  "The right of the people to be secure in their persons, houses, papers and effects, against

3  unreasonable searches and seizures, shall not be violated..." The United States Supreme

4  Court has interpreted the Fourth Amendment as requiring state and federal courts to

5  exclude evidence that government officials obtained in violation of the amendment's

6  protections. (Mapp, 367 U.S. at p. 655.) One of those protections is that a government

7  official must obtain a warrant from a judicial officer before conducting a search or

8  seizure. "The point of the Fourth Amendment, which often is not grasped by zealous

9  officers, is not that it denies law enforcement the support of the usual inferences

10  which reasonable people draw from evidence. Its protections consists in requiring

11  that those inferences be drawn by a neutral and detached magistrate instead of being

12  judged by an officer engaged in the often competitive enterprise of ferreting out

13  crime... [Therefore,] when the right of privacy must reasonably yield to the right

14  of search is, as a rule, to be decided by a judicial officer, not by a policeman, or

15  government enforcement agent." (Johnson v. United States (1948) 333 U.S. 10, 13-14.)

16  (People v. Williams (1999) 20 Cal. 4th 119, 125. Emphasis added.)

17         By enacting section 22655.5, the legislature has replaced the Fourth

18  Amendment's requirement that a probable cause determination by made by a

19  judicial officer, and instead granted such authority to every peace officer in the

20  state. Such statue is, in effect, a prohibited general warrant, also known as a

21  "writ of assistance", to seize private vehicles from private property without a

22  warrant based on probable cause or other exigent circumstance as determined by

23  a police officer in California. (Stanford v. Texas (1965) 379 U.S. 476, 481; Marcus

24  v. Search Warrants (1961) 367 U.S. 717, 724-729; and Boyd v. United States

25  (1886) 116 U.S. 616, 625.)

26         In Magistrate's Report and Recommendation she cites cases in which the

27  owner of the seized vehicle was present - either in or around the vehicle while

28  being observed by police officers who from their observations found probable cause

12

1    In petitioner's case, he was not present, in or around his vehicle at the
2  time of it being seized. The police formed probable cause from the statements
3  made by Roxanne Chavez and in infering themselves that a robbery took place.
4    In regarding the circumstances of the seizures and searches of petitioner's
5  car, Detective McFalls testified that on May 27, 2003, Erin told police that she had
6  been sexually assaulted in a car whose license plates matched a car registered
7  to petitioner. Erin also provided a physical description of the car. Roxanne told
8  police on July 17, 2003 that a man had robbed her of her purse at knifepoint in a
9  car that matched the description of petitioner's vehicle. Roxanne identified her
10  assailant in a photographic lineup.
11    Detective McFall lied in trying to establish probable cause for the search and
12  seizure of petitioner's vehicle. On May 27, 2003, Erin did not tell police that she had
13  been sexually assaulted, she merely stated that she was robbed. This case was
14  initially assigned to the robbery division. Not until July 23, 2003 does Erin tell
15  police she was raped. On July 17, 2003, Roxanne stated she had left her purse,
16  wallet, and black sandals on the floor of the passenger's front side in petitioner's
17  car. She does not state she was robbed. Petitioner was not convicted of robbery
18  against Roxanne. Roxanne lied on the account of what happened that day also.
19  She later admits to this and that she was working as a prostitute and had
20  consensual sex with the petitioner. (See May 27 and July 17 police reports of
21  Erin and Roxanne at the back of this Objections Report).
22    In conclusion, the statue is unconstitutional under the Fourth Amendment,
23  the police lied in there reasons for probable cause, and the seizure of petitioners
24  vehicle was unlawful. The evidence seized from the vehicle should have been
25  suppressed as fruit of the poisonous tree. (Wong Sun v. United States (1963)
26  371 U.S. 471; People v. Williams, supra, 45 Cal. 3d 1268.)
27    2. Search of Closed Purse
28    Having seized petitioner's vehicle on July 19, 2003, police then conducted

13

1  an "inventory search" as to its contents. During the search, police found a
2  woman's purse in the trunk of the vehicle. The purse was opened, and a woman's
3  military identification card was found inside. While police claimed the inventory
4  search was conducted pursuant to established department guidelines, there was no
5  showing that the closed purse was opened and searched pursuant to any such procedures.
6      In Colorado v. Bertine, the court, "also recognized the risk that police might
7  use an inventory of this kind as a pretext for searching a vehicle for contraband or
8  other evidence. (Id. at pp. 375-376.) Accordingly, the court emphasized that police
9  must "follow standard procedures." (Id. at p. 372, see also id. at p. 374, fn. 6.)
10  "Reasonable police regulations relating to inventory procedures administered in
11  good faith satisfy the Fourth Amendment." (Id. at p. 374, 107 S. Ct. 738.)
12  (People v. Williams, supra, 20 Cal. 4th 119, 139. South Dakota v. Opperman, supra,
13  428 U.S. 364, 371-374.)
14      In Florida v. Wells (1990) 495 U.S. 1, the Supreme Court affirmed the same
15  principle. There, the police inventoried a car's contents and found marijuana
16  in a locked suitcase in the trunk. (Wells, supra, 495 U.S. at p. 2.) The court
17  concluded that the trial court should have suppressed the evidence because
18  police had "no policy whatever with respect to the opening of closed containers
19  encountered during an inventory search." (Id at pp. 4-5) The court added, "Our
20  view that standardized criteria [citation] or established routine [citation] must
21  regulate the opening of containers found during inventory searches is based on
22  the principle that an inventory search must not be a ruse for a general rummaging
23  in order to discover incriminating evidence. The policy or practice governing
24  inventory searches should be designed to produce an inventory." (Id at p. 4.)
25      As in People v. Williams, supra, the record here indicates that the police
26  had a policy requiring them to inventory the contents of a vehicle before towing
27  it, but the record contains no evidence of any policy on the opening of closed
28  containers. (Wells, supra, 495 U.S. at p. 3.) Of course, Wells does not require a

1  written policy governing closed containers or a policy that leaves no room for
2  police discretion, but the record must at least indicate that police were following
3  some "standardized criteria" or "established routine" when they elected to open
4  the containers (Id. at p. 4), and the record here fails to do so. (People v. Williams,
5  supra, 20 Cal. 4th at 125.)

6      Without a showing that the police department had established procedures
7  governing the opening of closed containers encountered during an automobile
8  inventory search, and that such guidelines were followed in this case, the search of
9  the purse was unreasonable under the Fourth Amendment. The evidence seized
10 from inside the purse should therefore have been suppressed.

11     The police had not established probable cause based on the reason stated
12 on p.    of petitioner's objection report. The vehicle and its containers should
13 not have been searched.

14     Officer Shebolski stated he was only conducting an inventory search but
15 clearly he was conducting a more thorough search seeking the alleged "stolen"
16 purse. He searched the glove compartment, middle console, under the seats,
17 the pockets in the back of the front seats, and the trunk. He was clearly
18 rummaging in order to discover incriminating evidence.

19     3. August 6, 2003 Search
20     The search of petitioner's vehicle executed on August 6, 2003, was based
21 on a warrant issued on July 23, 2003, and therefore exceeded the ten day
22 time limit of Penal Code section 1534 subd. (a) which states: A search warrant
23 shall be executed and returned within 10 days after the date of issuance. A
24 warrant executed within the 10-day period shall be deemed to have been
25 timely executed and no further order of timeliness need be made. After the
26 expiration of 10 days, the warrant, unless executed, is void... (Emphasis added.)

27     In California, as in many other jurisdictions, a warrant expires 10
28 days after its issuance by a magistrate. (Penal Code section 1534 subd. (a).).

1   Filing a return is "essentially ministerial in nature" and the courts have found delays
2   in the return of a search warrant which have exceeded the 10-day period, however,
3   calculated, as nonprejudicial. (See, e.g., People v. Couch (1979) 97 Cal. App. 3d 377, 380.)
4   "But failure to execute a warrant within the ten-day statutory period may not be
5   excused as a mere ministerial or clerical aspect of search warrant proceedings' (People
6   v. De Jesus (1984) 125 Misc. 2d 963 [480 N.Y.S.2d 807, 809], Sgro v. United States (1932)
7   287 U.S. 206.)" (People v. Clayton (1993) 18 Cal. App. 4th 440, 446.)
8        That this is a state law-based rule does not save the violation from suppression
9   of the evidence seized, under California Constitution, art. I, section 28 subd. (d). That is
10  because, by operation of state law, the warrant had expired. There was, in effect, no
11  warrant. A warrantless search is an unreasonable search under the Fourth Amendment,
12  unless it meets one of the recognized exceptions.
13       Petitioner is aware of cases such as Texas v. White (1975) 423 U.S. 67, Chambers
14  v. Maroney (1970) 399 U.S. 42, and United States v. Garcia (9th Cir. 2000) 205 F.3d 1182, 1187-
15  1188, each holding that a vehicle may be searched upon probable cause, even after it has
16  impounded it and is in police custody. However, in each case the vehicle was searched
17  within hours of being impounded. In petitioner's case, the vehicle was searched, under
18  the purported authority of an expired warrant, nearly three weeks later after it was
19  impounded, a week later after expiration. The probable cause the police used on
20  justifying the automobile exception rule was of questionable character - it was based on
21  untruths told by Roxanne and the police themselves at the evidentiary hearing.
22       The expired warrant relied upon for the August 6, 2003, search of petitioner's
23  vehicle was equivalent to no warrant at all. Under the Fourth Amendment, the search
24  was unreasonable, the state court's decision was unreasonable. The knife and other
25  items found in this search should have been suppressed.
26       Petitioner disagrees and objects to the Magistrate's Recommendation on Ground
27  Two. The three arguments put forth by Petitioner had merit. Petitioner demonstrated
28  that his counsel failed to raise those arguments and was constitutionally deficient in

1  failing to do so. The state court decision denying the ineffective assistance of counsel claim
2  was contrary to, and an unreasonable application of, clearly established Supreme Court law.
3  Petitioner's claim in Ground Two should be granted.

Evidentiary Hearing

5      Petitioner requests an evidentiary hearing for all of his claims. His claims
6  in his Petition have merit, therefore, his request should be Granted.

Appointment of Counsel

8      Petitioner requests appointment of counsel in the interest of seeking justice.
9  For that reason, petitioner asks that request be granted.

10

Conclusion

12      Petitioner Objects to the Magistrates Report and Recommendation in its
13  entirety concerning what actions should be taken concerning petitioner's Petition,
14  the Grounds contained in it, the request for an evidentiary and appointment of
15  counsel.

16      Petitioner asks that the U.S. District Judge grant his Petition in its
17  entirety along with his motion for an evidentiary hearing and appointment for
18  counsel.

19

20  Dated: August 20, 2008

Respectfully submitted,

Christopher Adame

Christopher Adame,

Petitioner, In Pro Per

07/28/03  09:17    SDPD SI  CRIMES → 6196856540                    NO.324  P013/015

*I couldn't locate pages 9, 17, 18, 19, 23-29, and 34   David*

## San Diego Police Department
### Investigator's Report

**Date of incident:**      05-27-03

**Time of incident:**      2315 Hrs.

**Location of incident:** 4055 Camino Del Rio South

**Subject:**              211 PC/Ref. SDPD case # 03-034735

## INVESTIGATION:

On 05-28-03 I received a crime report where Erin KERCHNER, working as a prostitute, was robbed at knifepoint by a male she had just had sex with. KERCHNER wrote down the license plate number of the suspect's car as he drove away. When I received the report I called the phone number listed on the crime report and talked to a male, stating he was KERCHNER'S grandfather. I left my name and number and asked him to give it to KERCHNER. I then ran a records on the suspects vehicle '4KEL120, which came back to a 2000 Pontiac 4door and registered to male named Christopher ADAME. ADAME listed his address as 4344 Stanford St. in Carlsbad, Ca. I ran a records check on ADAME and found he had a prior arrest with a booking photo on file. I pulled the photo and put together a photo lineup containing ADAME and five similar pictures.

I still had not received a call from KERCHNER as of 06-04-03 so I placed her in the investigative supplemental. I was finally able to talk to KERCHNER on or about 06-10-03 on the telephone. I set up a time on about 06-13-03 to interview KERCHNER, which she cancelled on the 13th. I talked to her on about 06-17-03 and told her to come my office on 06-20 so I could talk to her. KERCHNER again failed to show up for the interview. I called her residence and her grandfather didn't know where she was. I had run a records check on KERCHNER and on one of the field interview done on her found another phone number listed as her home phone. I called the number, 619-258-1353, and found it was KERCHNER'S aunt, named Mary. Mary told me KERCHNER just found out she was pregnant and was at the clinic getting medical attention. I asked Mary to have KERCHNER call me when she returned home, which she never did.

I did not show KERCHNER a photo lineup of ADAME and I did not interview her regarding the robbery. There was an empty condom wrapper left at the scene by the suspect that I requested the lab check for fingerprints. The results are not back yet.

Reporting officer ___Robbie Finch___                ID # 3404 Division ___Eastern___

Approved by: _____          Date_____ 2003

Case #03-037625
Page 11 of 23

On July 14, 2003, I received copies of Pamela Jorge's two sets of fingerprints from the S.D.S.O. I submitted these prints with the prints I received from the D.M.V. to the S.D.P.D. Latent Print Unit for comparison.

On July 21, 2003, I received another sexual assault case, #03-047017. The victim in that incident, Roxanne Chavez, reported she took the bus to the North Park area of San Diego to meet her friend, Adrian Jarvis, at the Carl's Jr. Restaurant on (3008) El Cajon Blvd. Chavez got off of the bus because she thought she was going the wrong way and she wasn't sure where she was. A Hispanic male drove up in a green Pontiac 4-door vehicle and offered her a ride to the Carl's Jr. Chavez got into the car and the male drove onto the freeway. He exited the freeway and went behind a building. He asked Chavez to give him a 'blow job' (oral copulation) and she refused. He pulled out a knife with a 5" blade, pointed it at Chavez and told her to get out of the car. She did so, but left her purse, wallet and black sandals in the car. The suspect fled and Chavez started walking until she saw a police officer.

Officer Barmer stopped to talk to her. Chavez pointed out 3465 Camino Del Rio South where the robbery occurred. Officer Barmer broadcasted the suspect and vehicle information. Police Communications advised of a previous incident involving a robbery (Case #03-034735). The suspect in that case was driving a gray Pontiac Grand Am, 4-door, California license plate 4KEL120. The registered owner of the vehicle was Christopher Adame, at 4344 Stanford Street, Carlsbad, California.

Sgt. Ken Stewart #3640 drove to the Eastern Division station and prepared a photographic line-up from the computer Mug Shot System, including Christopher Adame's photograph. Sgt. Stewart arrived at Officer Barmer's location and Officer Barmer presented the line-up to Chavez. Chavez pointed to Adame in the #3 position and said, "Are these the only photos you have? Right off the bat, I'm gonna say this is the guy, but his hair is shorter and combed to the back."

The officers notified Carlsbad Police department. Officers from that city checked Adame's residence, but Adame's vehicle was not there. See Officer Barmer's and Sgt. Stewart's reports for details.

The following night, Sgt. Stewart drove to 4344 Stanford Street in Carlsbad and located Adame's vehicle (2000 Pontiac Grand Am, 4KEL120/CA). Officers Peterson #5188, Eric Oberndorfer #5672 and S. Shebloski #5317 responded to his location to assist him. Officer Oberndorfer impounded the suspect's vehicle as evidence of a crime. In an inventory of the vehicle, Officer Shebloski located a woman's black leather purse, Roxanne Chavez's driver's license, passport, paperwork bearing Chavez's name and cosmetics. Officer Shebloski obtained two Polaroid photographs of the vehicle trunk, depicting where Chavez's purse was located. He impounded the vehicle per section 22655.5 (a) CVC (Vehicle Used in a Crime). Officer Shebloski impounded Chavez's purse and contents at the Eastern Division station on property tag #891856. See Officer Shebloski's and Oberndorfer's reports for details.

On July 19, 2003, Sgt. David Johnson #27-- from the Sex Crimes Unit called me at my residence and told me about the above described cases. He also said the robbery occurred on May 27,

*Proof of Service — Mail*

## PROOF OF SERVICE

Re:     Case Number: 08cv0787HCAB

Case Title: Objections to Magistrate's Report and Recommendation Regarding Petition of Writ of Habeas Corpus

I hereby declare that I am a citizen of the United States, am over 18 years of age, and am/am not a party in the above-entitled action. I am employed in/reside in the County of Kings and my business/residence address is CSATF, E2-116ᵁ, P.O. Box 5242, Corcoran, CA 93212

On August 20, 2008, I served the attached document described as a Objections to Magistrate's Report and Recommendation Regarding Petition of Writ of Habeas Corpus

on the parties in the above-named case. I did this by enclosing true copies of the document in sealed envelopes with postage fully prepaid thereon. I then placed the envelopes in a U.S. Postal Service mailbox in CSATF State Prison, California, addressed as follows:

Kyle Niki Shaffer, Office of the Attorney General

110 West A Street, Suite 1100,

P.O. Box 85266

San Diego, CA 92186-5266

I, Christopher Adame, declare under penalty of perjury that the foregoing is true and correct.

Executed on August 20, 2008, at Corcoran, California.

*Christopher Adame*
Signature

*Proof of Service — Mail*

## PROOF OF SERVICE

Re:     Case Number  08cv0787HCAB

Case Title  Objections to Magistrate's Report and Recommendation Regarding Petition of Writ of Habeas Corpus

I hereby declare that I am a citizen of the United States, am over 18 years of age, and am/am not a party in the above-entitled action. I am employed in/reside in the County of  Kings  and my business/residence address is  CSATF, E2-116ᵘ, P.O. Box 5242, Corcoran, CA 93212

On  August 20, 2008 , I served the attached document described as a  Objections to Magistrate's Report and Recommendation Regarding Petition of Writ of Habeas Corpus

on the parties in the above-named case. I did this by enclosing true copies of the document in sealed envelopes with postage fully prepaid thereon. I then placed the envelopes in a U.S. Postal Service mailbox in CSATF State Prison, California, addressed as follows:

Kyle Niki Shaffer, Office of the Attorney General

110 West A Street, Suite 1100,

P.O. Box 85266

San Diego, CA 92186-5266

I,  Christopher Adame , declare under penalty of perjury that the foregoing is true and correct.

Executed on  August 20, 2008 , at  Corcoran , California.

*Christopher Adame*
Signature